**In re TML, INC., Debtor.**

**Word Investments, Inc., Plaintiff,**

**v.**

**Thomas A. Bruinsma, Trustee, Defendant.**

**Bankruptcy No. GG 97–00121. Adversary No. 98–88283.**

United States Bankruptcy Court, W.D. Michigan.

March 26, 2003.

James B. Frakie, Wheeler Upham, Grand Rapids, Michigan, Scott H. Hogan, Tolley, Vandenbosch, Korolewicz & Brengle, P.C., Grand Rapids, Michigan, for Plaintiff Word Investments, Inc.

Jeff A. Moyer, Stenger & Stenger, P.C., Grand Rapids, Michigan, for Thomas A. Bruinsma, Chapter 7 Trustee.

*OPINION*

JAMES D. GREGG, Chief Judge.

### I. ISSUES

Who is entitled to the remaining escrowed proceeds from a sale of estate property? Is the Plaintiff's claim to those proceeds defeated by the doctrine of contribution or merger? May the Defendant Trustee recover an asserted fraudulent conveyance for excess rent paid by the Debtor to the Plaintiff?

### II. JURISDICTION

The court has jurisdiction over this bankruptcy case. 28 U.S.C. § 1334. The bankruptcy case and all related proceedings have been referred to this court for decision. 28 U.S.C. § 157(a) and L.R. 83.2(a) (W.D.Mich.). This adversary proceeding is a core proceeding because it involves the allowance or disallowance of claims against the estate, counterclaims by the estate, and seeks an avoidance and recovery of fraudulent conveyances. 28 U.S.C. § 157(b)(2)(B), (C), and (H). This opinion constitutes the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052.

### III. PROCEDURAL HISTORY

Debtor, TML, Inc. ("TML") filed a voluntary petition under chapter 7 of the Bankruptcy Code on January 7, 1997.[1] Thomas A. Bruinsma ("Trustee") was appointed as the chapter 7 trustee.

On March 6, 1997, this court entered an Order Granting Trustee's Motion to Hire Auctioneer, Sell Assets and Pay Certain Secured Creditors (the "Sale Order"). Exh. 15; Dkt. No. 51. The Sale Order authorized the Trustee to conduct a public auction to sell various items of TML's

---

**1.** The Bankruptcy Code is contained in 11 U.S.C. §§ 101–1330. Unless stated to the contrary, all future statutory references are to the Bankruptcy Code, e.g., "§ ___."

personal property. The Sale Order also directed the Trustee to hold at least $45,000 of the sale proceeds in an escrow account to "protect the interests" of TML's principal lender, FMB–First Michigan Bank–Zeeland ("FMB"), with respect to a "certain secured Promissory Note" that had been "executed jointly" by TML and its landlord, Word Investments, Inc. ("Word"). Exh. 15; Dkt. No.51. The funds from the note referred to in the Sale Order had been used by TML to build a loading dock on real property it leased from Word (the "loading dock note").

After the Sale Order, on April 30, 1997, FMB and Word executed an assignment agreement, under which Word paid FMB $44,489.22, the balance owing under the loading dock note at that time. Exh. 22/J.2. In exchange, FMB assigned all of its "right, title, and interest in and to [the $45,000] escrow account" established under the Sale Order to Word.[2] Exh. 22/J.2.

On May 18, 1998, Word commenced this adversary proceeding, seeking to establish its right to the funds held in the escrow account. Adversary Proceeding ("AP") Dkt. No. 1. Specifically, Word asserts that it "stepped into the shoes" of FMB when it paid off the balance of the TML/Word note and took an assignment of FMB's position. AP Dkt. No. 1. On July 15, 1998, the Trustee filed his answer to Word's complaint, asserting seven affirmative defenses and eight counterclaims.[3] AP Dkt. No. 3.

After the Trustee's motion for summary judgment regarding the merger counterclaim was denied,[4] and following an apparently unsuccessful attempt by the parties to mediate this dispute,[5] the Trustee filed an amended answer and counterclaim on May 5, 2000. AP Dkt. No. 46. The Trustee withdrew all of his previous counterclaims, except for those based upon merger and contribution. The Trustee also added a new counterclaim. He alleged that TML's rent payments to Word for the six years preceding the bankruptcy filing constituted fraudulent conveyances.[6]

After agreed upon adjournments of trial, resulting mainly from the numerous unsuccessful settlement discussions and scheduling conflicts of the parties' attorneys, the trial finally took place on May 23 and 24, 2002. At the conclusion of the trial, the court gave the parties the opportunity to submit post-trial legal memoranda. Both parties did so. The parties also presented oral closing arguments to the court on June 21, 2002.

### IV. FINDINGS OF FACT

A. *The Original Leases and Sale of the Leased Premises to Word Investments, Inc.*

TML was a trucking company, owned and operated by members of the Bishop

---

2. The assignment agreement is discussed in greater detail *infra* Part IV.L.

3. The Trustee's counterclaims were based upon merger, marshaling, contribution, equitable subordination, subrogation, avoidance of preferential transfers, breach of contract, and unjust enrichment.

4. This court entered an Order Denying Trustee's Motion for Partial Summary Judgment Regarding Merger on February 19, 1999. AP Dkt. No. 25.

5. A Stipulation and Order Regarding Mediation was signed by this court on December 16, 1999. AP Dkt. Nos. 36 and 37.

6. The Trustee does not allege that entering into the leases themselves constituted fraudulent conveyances. Rather he seeks to avoid "each transfer" of rent from TML to Word to the extent that it exceeded the fair market rental value for the leased premises. AP Dkt. No. 46.

family.[7] TML conducted its business out of two buildings located on adjacent lots at 345 Pleasant, S.W., and 607 Century, S.W., in Grand Rapids, Michigan (hereinafter "345 Pleasant," "607 Century," or collectively, the "leased premises").

The original lease of 607 Century, dated September 1, 1994, was between Corneluis A. and Betty Ann Bishop, as landlords, and Bishop Motor Express, as tenant. Exh. 3/C.1. This lease called for rent payments at the rate of $60,000 per year ($5,000 per month) plus annual "cost of living" rent increases ("COL increases") in accordance with the Consumer Price Index ("CPI"). Exh. 3/C.1. On December 6, 1985, Bishop Motor Express assigned its tenant's interest to TML.[8] Exh. 3/C.1.A. Per this assignment, Bishop Motor Express continued to sublet the lower level of the building located at 607 Century for five years at the rate of $1,000 per month. Exh. 3/C.1.A.

The original lease of 345 Pleasant, dated December 1, 1986, was between Cornelius Bishop as landlord and TML as tenant.[9] Exh. 4. The lease had a ten year term and purported to run from January 1, 1987, to December 1, 1997. Exh. 4. Under the lease, TML was to make rent payments to Cornelius Bishop at the rate of $60,000 per year ($5,000 per month). Exh. 4. Like the 607 Century lease, this lease also called for annual COL increases of the base rent amount in accordance with the CPI. Exh. 4.

On January 5, 1988, Bishop Real Estate,[10] an entity owned by Cornelius Bishop, sold the leased premises to Word Investments, Inc. for $620,000. Exhs. 1 and 2/C.1.C. Word is a non-profit organization that invests in real estate, securities and notes. It donates the returns from these investments to various religious charities.[11] Tr. II at 107. The President of Word, De Graaf, had been a childhood acquaintance of the Bishop family. He testified that he had not been in contact with any members of the Bishop family for the twenty-five to thirty years preceding the sale of the leased premises from Bishop Real Estate to Word. Tr. II at 108. De Graaf characterized the sale as an "arms length" transaction. Tr. II at 109. The leases of 607 Century and 345 Pleasant were assigned to Word as part of the sale transaction.[12] Although De Graaf claims that he did not do much analysis regarding the properties' "income stream" prior to the sale, he stated that he considered the leases "profitable." Tr. II at 132, 150.

7. As of March, 1993, the TML Board of Directors included C.A. Bishop (presumably Cornelius A. Bishop), his sons, Alan Bishop, Kim Bishop, Scott Bishop, and Steve Bishop, and his son-in-law, Fred Cooper. Exh. M. As explained *infra* Part IV.E., Clare De Graaf ("De Graaf"), President of Word, also served on TML's Board of Directors from January 7 until July 12, 1993. Exh. M.

8. Cornelius and Betty Bishop also assigned their interests under the lease on two separate occasions: first, to Cornelius Bishop in an agreement dated July 29, 1986, and subsequently to Bishop Real Estate on December 31, 1986. Exh. 3/C.1.B. Cornelius and Betty Bishop apparently divorced sometime in 1987. Tr. II at 134.

9. Cornelius Bishop assigned his interest in the lease to Bishop Real Estate pursuant to an agreement dated December 31, 1986. Exh. 4.

10. On this date, in accordance with the prior assignments of interest described above, Bishop Real Estate was the sole owner of the leased premises.

11. Word's religious activities are irrelevant to the factual findings and conclusions of law made by this court. FED. R. EVID. 610.

12. When the leases were assigned to Word in 1988, the total monthly rent for the leased premises was $10,457.50. Exhs. 32/S and 12.

A letter written to De Graaf by Steve Bishop on behalf of TML, dated August 8 (or 9), 1988, provides insight into the circumstances of the original leases. Exh. Q.17. In the letter, Steve Bishop pleads with De Graaf to consider restructuring the TML leases on terms more favorable to TML. Exh. Q.17. The letter explains that the Bishop brothers, on behalf of TML, entered into the original, "exorbident" [sic] lease with their father, Cornelius, with the understanding that the lease rates included "other fixtures and article" [sic]. Exh. Q.17. The August 1998 letter also states that Cornelius "forced" TML to sign the lease, by telling his sons that it was "owed to him" and that TML would not be able to survive without his continued support. Exh. Q.17. According to the letter, the Bishop brothers signed the lease feeling that they had no other choice and that the lease would, at least, keep the property in their family. Exh. Q.17.

Importantly, De Graaf characterized the leases in a similar manner in a letter to the Grand Rapids' City Assessor's Office dated November 16, 1989. Exh. N.5. De Graaf's letter, which was written at TML's request, explains:

> I purchased this property and lease from Cornie Bishop, the founder of TML, the current tenant. Frankly, *the lease income bears little relationship to the value of the property* for the following reasons:
>
> 1. The *generous* lease was basically a buy out of the business, which was sold to his four sons.
>
> 2. The lease and building sale was done quickly to *generate cash* for a divorce settlement.
>
> 3. The income reflects the financial instability of the company as evidenced by the fact that from August to December, 1989 we are receiving only one half rent (see attached letter).
>
> 4. A 9,300 sq. ft. addition paid for by the tenant was made to the property costing approximately $193,000.00, in 1998 with no increase in rent . . . .
>
> I believe the rent value of the property is no more than 650,000 with the new improvements . . . .

Exh. N.5. (emphasis added).

B. *The Loading Dock.*

Shortly after Word purchased the leased premises and assumed the leases, Alan Bishop, then president of TML, approached De Graaf to inquire about the possibility of building a large loading dock on the property. Although TML asked Word to finance the proposed loading dock project directly, Word declined to do so. Tr. II at 110–11. Upon the request of TML, however, Word agreed to assist TML in procuring outside financing to fund the project. Tr. II at 111. The written agreement between Word and TML is dated September 14, 1988 (the "loading dock agreement"). Exh. 5/C.2. Under the loading dock agreement, TML was permitted to finance construction of the loading dock in an amount not to exceed $200,000. Exh. 5/C.2, ¶ 2. TML was authorized to secure the repayment of the debt by granting the lender a mortgage on a portion of the leased premises. Exh. 5/C.2, ¶ 2. Although the "costs of construction [were to] be borne entirely by [TML]," Word agreed:

> to join in the execution of the mortgage for the sole purpose of subjecting its ownership interest in the premises to the lien of the mortgage and to become liable as guarantor under the provisions of any promissory note made by the lessee payable to the proposed lending institution but only on terms satisfactory to [Word].

Exh. 5/C.2, ¶¶ 1 and 2. The loading dock agreement also provided that upon the

expiration of the lease in August of 1999, Word would "reimburse [TML] with the amount of its construction costs up to the sum of $200,000" (the "$200,000 buyback"), provided that TML was not in default under the terms of the leases or the mortgage.[13] Exh. 5/C.2, ¶ 6. Although TML was required to make the new monthly mortgage payments, the monthly rent on the leased premises was not increased as a result of the loading dock agreement.[14] Exh. 5/C.2., ¶ 4; Tr. II at 112–13, 136. De Graaf stated that the $200,000 buy-back amount was not amortized over the remaining terms of the leases. Tr. II at 112–13.

As contemplated under the loading dock agreement, TML obtained a five year, $200,000 loan from FMB on September 15, 1988.[15] The promissory note (the "loading dock note") executed in connection with the loan was signed by Alan Bishop, on behalf of TML, and by De Graaf, on behalf of Word. Exh. 6/A.1. Both signatures appear in the bottom right corner of the loading dock note, on the lines designated for "borrower's signature(s)." Exh. 6/A.1. The loading dock note specifically references the loading dock agreement between Word and TML and provides that, should TML default under the terms of the note, FMB will give Word thirty days' written notice before taking any action against Word or the real property. Exh. 6/A.1. Boilerplate language on the second page of the note states that "[f]or value received, the undersigned (who, if two or more in number, shall be jointly and severally liable hereunder) hereby unconditionally guarantee the payment of the Note . . . ."[16] Exh. 6/A.1.

As security for the loading dock note, Word granted FMB a mortgage against 607 Century. Exh. 7/A.2. Word also executed a commercial security agreement, granting FMB a security interest in fixtures located on the 607 Century property (collectively the "FMB security agreements").[17] Exhs. 8/A.3 and 9/A.4.

It appears that the proceeds from the loading dock note were placed in a building escrow account. Exh. A.6. There is no evidence indicating that Word received any of the loan proceeds directly. Tr. I at 90. According to De Graaf's testimony, the construction of the loading dock was completed within six to eight months after the

13. In effect, this agreement resulted in TML paying the mortgage debt to build Word's equity in the property which now included a new loading dock; TML would only receive the possible financial benefit of the additional value at the conclusion of the lease.

14. In fact, although the base rent did not change under the loading dock agreement, the agreement actually provided for a twenty-five percent reduction in the annual COL escalators under the respective leases. Exh. 5/C.2., ¶ 7. This reduction was premised upon TML making timely monthly payments. Exh. 5/C.2, ¶ 7.

15. TML had obtained several other loans from FMB prior to September, 1988. Exh. 23. As a result of these previous loans, FMB held a blanket security interest in nearly all of TML's assets, including its inventory, equip-

ment, and accounts. Stipulation of Facts, ¶ 7, AP Dkt. No. 83.

16. Although FMB used preprinted guarantor's forms at the time the loading dock note was executed, no such form was executed in connection with the loading dock note. Tr. I at 58.

17. As a result of previous loans between FMB and TML, FMB also held a "continuing security interest" in virtually all of TML's assets. Exh. 23; Stipulation of Facts, ¶ 7, AP Dkt. No. 83; Tr. I at 57–58. FMB's prior security interest covered "the payment of all loans, advances, and extensions of credit from [FMB] to [TML], including all renewals or extensions thereof and any and all obligations of every kind whatsoever, whether heretofore, now, or hereafter existing or arising between [FMB] and [TML] . . . ." Exh. 23.

execution of the loading dock note. Tr. II at 113.

## C. Rent Payments (or Lack Thereof) From 1988–1991.

When Word purchased the leased premises in 1988, the total monthly rent under both leases was $10,457.50. Exhs. 32/S and 12. According to a "rent analysis" prepared by Word in 1997, TML paid this amount to Word each month from February through December, 1988. Exh. 32/S. Several of these payments were late, and De Graaf informed TML in a letter dated December 2, 1988, that "three of the last four months' payments have been late" thus violating the terms of the loading dock agreement. Exh. 12. As a result of these late rent payments, Word imposed the 1989 COL rent increase at 100% of the CPI. Exh. 12. The revised COL increased the total monthly rent due under both leases to $10,877.50. Exh. 12. Word offered to limit the COL increase for 1990 to 50% of the CPI if all rents for 1989 were timely paid. Exh. 12.

Word's internal records reveal that TML tardily paid each monthly lease obligation from January through July of 1989. Exh. 32/S. From August through December of 1989, TML only paid $5,438.75 per month (or one half of its monthly lease obligation) to Word. Exhs. 32/S and N.5. Based on this payment history, Word again increased the monthly rent under the leases for 1990 by 100% of the CPI. Exh. 12. This increase resulted in a 1990 lease obligation of $11,347.50 per month. Exh. 12.

On January 12, 1990, TML executed a promissory note for $27,193.75, payable to Word. Exh. O.1. The purpose of the note was to pay off the balance of TML's unpaid rent for the time period from August through December, 1989 ($5,438.75 for five months). Exh. O.1 and Tr. II at 139–40. The note provided for interest at a rate of eleven percent per annum and was due on December 31, 1991. Exh. O.1.

On January 19, 1990, a second promissory note was executed by TML in the amount of $125,000. Exh. O.2. Somewhat curiously, this note was payable to De Graaf personally; the note was guaranteed by Alan Bishop, a principal of TML, and his wife Patricia. Exh. O.2. The note was secured by a mortgage on Bishop's East Grand Rapids residence.[18] Exh. O.2. The note was due on January 19, 1993, and provided for interest at a rate of sixteen percent for the first year, seventeen percent for the second year, and eighteen percent for the third year. Exh. O.2.

During 1990, TML made several partial rent payments to Word each month. Exh. 32/S. Although many of its payments were late, in total, TML paid $131,312.35 out of $136,170 that was due under the leases for 1990. Exh. 32/S.

In a letter dated December 6, 1990, signed by De Graaf, Word informed TML that the annual COL rent adjustment would result in an increased lease obligation of $11,977.50 per month. Exh. 12. According to Word's records, TML continued to pay Word by making several partial rent payments each month throughout 1991. Exh. 32/S. The records reflect that TML paid $143,059.78 of the $143,730.00 rent that was due under the leases during 1991. Exh. 32/S.

## D. Renegotiation of the Leases.

In August of 1991, the parties began a long series of negotiations that eventually resulted in the execution of a new lease agreement, more than three years later, in October of 1994. The first evidence of

---

**18.** It is not possible to ascertain the basis of TML's obligation from the record.

these negotiations is a letter written by Alan Bishop to De Graaf on August 29, 1991. Exh. Q.16. Bishop's letter requested a meeting with De Graaf to discuss the possibility of TML purchasing the leased premises from Word. Exh. Q.16. The letter characterized the leases as one aspect of TML's business that "truly hamper[ed]" its competitiveness. Exh. Q.16.

On October 2, 1992, Alan Bishop wrote a second letter to De Graaf, this time requesting a reduction in the monthly rent due under the leases. Exh. Q.15. Citing "uncertain revenues" and the economic recession that was occurring at the time, Bishop's letter explained that the "erroneous [sic] rent payment to Word" was one of TML's two largest expenses that needed to be reduced for the company to survive.[19] Exh. Q.15. Consequently, Bishop requested that Word reduce the rent payments due under the leases to "more realistic terms"—i.e., two thirds of the present rate with a COL increase cap.[20] Exh. Q.15. In exchange, TML offered to forfeit its right to the $200,000 buyback under the loading dock agreement. Exh. Q.15.

In response to Alan Bishop's second letter, De Graaf offered to reduce the rent due under the leases to $9,977.50 per month, provided that all rent payments were current, the $125,000 promissory note from TML to De Graaf was paid in full, TML's property tax arrearages were cured, and that both leases were extended through December of 2004. Exh. 12/Q.15. If these conditions were met, Word further offered to forgo imposing COL rent in-creases through December 30, 1995, and to cap the COL increases at three percent per annum thereafter. Exh. 12/Q.15. Word also offered to amend the loading dock agreement to provide that Word would reimburse TML for one half of the loading dock construction costs upon expiration of the leases in December of 2004. Exh. 12/Q.15.

During 1993 and 1994, the parties continued to exchange proposals that would allow TML to purchase the leased premises from Word and/or would reduce TML's monthly rent obligations under the leases. Exhs. Q.1, Q.2, Q.3, Q.4, Q.4.1, Q.5, Q.6, Q.7, Q.8, and Q.9. Many of these proposals involved TML purchasing the leased premises under arrangements that resembled land contract agreements. Exh. Q.1. Under one proposed agreement, TML offered to make monthly payments to Word of $8,500.00. Exh. Q.1. TML's proposal left the ultimate purchase price and interest rate open to negotiation. Exh. Q.1.

Word's counteroffers also contemplated allowing TML to make continued monthly payments and to eventually purchase the leased premises. One such proposal, made by Word in December 1993, set the price of the property at $725,000, with twelve percent interest amortized over a term of fifteen years, with a balloon payment in ten years. Exh. Q.4. Under this proposal, TML would have paid $8,500.00 to Word each month and would have been able to purchase the property for $354,941.00 at the end of the ten year term.[21] Exh. Q.4.

19. The other expense cited is TML's buyout debt to Cornelius Bishop. Q.15.

20. In 1992, the monthly rent payments under the leases were $11,977.50 per month. Exh. 12. Two thirds of this amount is approximately $7,985.00.

21. The proposal provided that the $27,193.75 promissory note executed by TML on January 12, 1990, and the interest thereon would be forgiven. Exh. Q.4. It also provided that another $30,000 promissory note owed to De Graaf (Exh. O.3) would be paid in full at the closing and that the $200,000 buyback under the loading dock agreement would be deemed void. Exh. Q.4. In addition, Word's proposal stated that if TML sold the property within ten years of purchasing it from Word, Word

A document dated March 8, 1994, and titled "TML, Inc. New Lease Calculations" further illustrates the formula used by the parties in arriving at the numbers ultimately agreed upon in the October 1, 1994, lease. Exh. Q.7. Under this formula, Word calculated the total amount that it would be entitled to collect if the original leases were to continue through the remainder of their terms. To arrive at this figure, Word added: $658,762.50, representing the estimated rent due under the leases from March 31, 1994, through the end of their terms; $24,336.49 for back taxes owed by TML; and $39,806.40, representing the amount owed to Word under the January 12, 1990, promissory note. Exh. Q.7. *Next, Word added $400,000, representing the estimated "value of the building and land," to this total.* Exh. Q.7. It then subtracted amounts it would "owe" TML if the leases were allowed to run for their full terms, i.e., $200,000 for the buyback under the loading dock agreement and $12,532.00 for insurance that was mistakenly paid by TML. Exh. Q.7. Subtracting an additional $100,000—which represented the amount TML would pay for its purchase option upon expiration of the lease—left a net total of $860,373.00 of "lease income" that would be generated if the terms of the original lease were enforced. Exh. Q.7. This amount was divided by 108 months to arrive at monthly rent

payments of approximately $8,000 per month. Exh. Q.7.

E. *Other Developments.*

During the lease renegotiation period, TML's and Word's relationship became more closely intertwined. For example, on January 7, 1993, De Graaf became a member of the TML Board of Directors. Exh. M. On January 18, 1993, he was elected Chairman of the Board.[22] Exh. M. However, approximately six months later, on July 12, 1993, De Graaf resigned from the TML Board of Directors citing concerns about TML's pending legal problems and frustration with the Board's treatment of Alan Bishop.[23] Exh. M; Tr. II at 118.

Also during this time period, on February 19, 1993, TML executed a $30,000 promissory note payable to De Graaf (the "February 1993 note").[24] Exh. O.3. This note provided for interest at a rate of eight percent per annum and was due on December 31, 1993. Exh. O.3. The note was signed by Cornelius Bishop as President of TML. Exh. O.3.

A fourth promissory note, in the principal amount of $30,703.88, was executed by TML on March 31, 1994. Exh. O.4. The parties apparently intended for this note to replace the February 1993 note. Exh. Q.8. This note was due on November 1, 1994, and was again payable to De Graaf rather

---

would be entitled to one half of the profits (defined as any amount over $554,941.00) from such sale. Exh. Q.4. The proposal further required TML to accept the property "as is" and to "absolve Word from any environmental liability" with respect to the leased premises. Exh. Q.4.

22. De Graaf testified that TML asked him to serve on its Board to assist it with "business issues" and to help mediate "interpersonal" disputes among members of the Bishop family. Tr. II at 117.

23. TML's stockholders apparently voted Alan Bishop off of the Board of Directors on April

20, 1993. Exh. M. De Graaf was a creditor of Alan Bishop and his wife. Alan Bishop and his wife had previously guaranteed repayment to De Graaf of a TML note in the principal amount of $125,000. Exh. O.2. The guarantee was secured by a mortgage on Bishop's residence. Exh. O.2.

24. The record does not reveal the purpose of the February 1993 note. However, because the note was payable to De Graaf rather than to Word, it seems that De Graaf must have loaned money to TML.

than to Word. Exh. O.4. The note carried an interest rate of eight percent per annum. Exh. O.4.

### F. *Rent Payments (or Lack Thereof) From 1992–1994.*

In November of 1991, De Graaf informed TML that he had decided not to impose a COL rent increase that year. Exh. 12. Consequently, the 1992 monthly rent for the leased premises remained at $11,977.50. Exh. 12. Throughout 1992, TML continued to make several partial rent payments each month. Exh. 32/S. According to Word's records, TML paid $153,022.74 in rent during 1992. Exh. 32/S.

TML's sporadic rent payments continued through 1993 and early 1994; there is no evidence to indicate that Word imposed any COL increases for these years. Exh. 32/S. In 1993, Word's records reflect that TML paid $124,672.48 of the $143,730.00 that was due under the leases. Exh. 32/S. From January 1 through March 30, 1994 TML paid a total of $46,337.05 in rent to Word.[25] Exh. 32/S.

### G. *Renewal of the Loading Dock Note.*

On November 12, 1993, TML and Word renewed the loading dock note with FMB.

Exh. 10/B.1. Like the original note, the renewal note was signed by representatives of both TML and Word. Exh. 10/B.1. The renewal note was in the principal amount of $113,653.12. Exh. 10/B.1. It was scheduled to mature on November 12, 1997. Exh. 10/B.1. Word executed an amended mortgage on 607 Century to continue to secure the indebtedness incurred under the renewal note. Exh. 11/B.2.

### H. *The 1994 Lease.*

Finally, after more than three years of negotiations, on October 1, 1994, TML and Word mutually agreed to terminate the previous leases of 607 Century and 345 Pleasant and the loading dock agreement. A new lease which covered both parcels of real property was executed (the "1994 lease").[26] Exh. 13/C.3, ¶ 1. The 1994 lease agreement was made between Word, as landlord, and BBC, LLC ("BBC"), an entity controlled by the spouses of TML's shareholders, as tenant. Exh. 13/C.3, Preamble; Stipulation of Facts, ¶ 9. Fred Cooper signed the lease as President of TML. The lease specifically acknowledged that BBC was "subletting the Leased Premises to TML, Inc."[27] Exh. 13/C.3, ¶ 16(A).

---

**25.** The first rent payment under the 1994 lease was not due until May 1, 1994. *See infra* note 28. For the first four months of 1994, TML's total rent obligation was $47,910.00.

**26.** The 1994 lease specifically states that it "supersedes and replaces all other agreements between the parties and between [Word] and TML . . . including but not limited to two separate lease agreements for the Leased Premises dated September 1, 1984, and December 1, 1986, respectively, and an Agreement dated September 14, 1988 dealing with an addition to the Leased Premises." Exh. 13/C.3, ¶ 1.

**27.** The 1994 lease further articulates TML's obligations under the lease as follows:

> TML is executing this Lease Agreement for the specific purpose of agreeing to assume and to keep and perform all of the terms of this Lease which are required on the part of Tenant to be kept and performed, and that TML shall be jointly and severally liable with Tenant for the performance thereof . . . . All references herein to Tenant (except for the conditional right to purchase contained in paragraph 39), shall be deemed to refer to TML with the same force and effect as applicable to the original Tenant.

Exh. 13/C.3, ¶ 16(A). Therefore, the court finds that, notwithstanding BBC's involvement, the lease parties continued to be Word and TML.

The 1994 lease had a term of 109 months, and ran from April 1, 1994, through April 30, 2003.[28] Exh. 13/C.3, ¶ 2(A). The base rent under the lease was $8,909.12 per month for the first two years of the lease and $8,000.00 per month thereafter. Exh. 13/C.3, ¶ 3(A). The lease also addressed FMB's mortgage and security interests in the property, providing that:

> TML, Inc. shall continue to pay all indebtedness secured by the [FMB security agreements] when due, and shall continue to perform when due any and all obligations required to be made by the debtor or the mortgagor under the [FMB security agreements]. TML, Inc. shall be solely responsible for payment of all such indebtedness and shall hold [Word] harmless from any loss or expense of any kind attributable thereto. It is acknowledged that this is the primary obligation of TML, Inc., and that such obligation will survive termination of this Lease.

Exh. 13/C.3, ¶ 4.

The 1994 lease also granted BBC/TML a conditional option to purchase the leased premises for $100,000 upon the expiration of the term of the lease. Exh. 13/C.3, ¶ 39(A) & (C). The right to exercise this option to purchase, however, was only valid if: (1) no "event of default" occurred at any time under the lease;[29] (2) upon failure to pay rent when it is due, the tenant "cures such failure [and] . . . also pay[s] all other unpaid obligations which are then due and owing"; and (3) the lease remained in effect for its full term, i.e., until April 30, 2003.[30] Exh. 13/C.3, ¶ 39(B).

Finally, the lease contained specific provisions relating to the environmental conditions on the leased premises. Exh. 13/C.3, ¶ 14. The provisions required the tenant to comply with applicable environmental laws and to implement containment and clean-up measures in the event that any hazardous substances were released on the leased premises. Exh. 13/C.3, ¶ 14(A). The lease also required the tenant to hold Word harmless from any damages or liability incurred as a result of the release of hazardous substances onto the property.[31] Exh. 13/C.3, ¶ 14(C).

### I. Rent Payments (or Lack Thereof) under the 1994 Lease.

It is not surprising that Word's records reflect that TML started making late or partial monthly payments under the 1994 lease almost immediately after it was executed. Exh. 32/S. By early 1996, Word's records indicate that it was still encountering difficulty collecting rent from TML.

---

**28.** The lease indicated that no base rent was due for April, 1994; the first rent payment under the 1994 lease was due on May 1, 1994. Exh. 13/C.3, ¶ 3(A).

**29.** As defined in the lease, "events of default" included: (1) failure to timely pay rent or any other sum due under the lease; (2) failure of TML to timely repay its $30,703.88 promissory note *to De Graaf*, (3) failure to comply with any other provision of the lease; and (4) failure of *TML to perform its obligations under* its security agreement with FMB. Exh. 13/C.3, ¶ 17(A).

**30.** In practicality, the possibility of TML meeting these requirements was extremely remote, indeed probably illusory, as De Graaf testified that TML was, with some "rare exceptions . . . pretty much constantly in default" under the terms of the leases. Tr. II at 113. However, De Graaf further explained that one of the reasons for entering into the 1994 lease was that TML believed that "$8,000 or $8,500 a month was something that [it] could do and could afford to do and could meet all of the rent payments." Tr. II at 123.

**31.** TML's apparent failure to comply with these environmental conditions resulted in Word filing a $66,152.70 unsecured nonpriority claim against TML's bankruptcy estate. Exh. 28.

Exh. D.1. In a letter dated February 29, 1996, De Graaf references the fact that TML's rent has been "consistently three to four weeks late the last several months" and warns TML that this practice has put its $100,000 option to purchase the leased premises in jeopardy. Exh. D.3. Because of its financial condition, TML continued to make untimely rent payments. Exh. 32/S. Consequently, on May 6, 1996, De Graaf sent a certified letter to TML,[32] notifying TML that it was in violation of its obligations under the 1994 lease and that it had ten days to cure this default as provided by the lease. Exh. D.4. TML did not cure the default within the allotted time. In a letter dated June 3, 1996, De Graaf notified TML and BBC that their option to purchase the leased premises had been terminated. Exh. D.7.

On November 26, 1996, De Graaf sent a final certified letter to TML, informing it that Word would be irrevocably terminating the lease as of December 12, 1996, due to uncured defaults by TML and BBC. Exh. 14/D.14.

### J. Proposed Sale of the Leased Premises.

In 1996, as TML's financial difficulties became more dire, Word began to consider the possibility of selling the leased premises to a third party. Exh. U.1. On November 6, 1996, Word entered into a buy/sell agreement under which it agreed to sell 607 Century to Ajax Window Corporation ("Ajax") for $525,000.[33] Exhs. U.4 and U.11.

### K. TML's Bankruptcy and the Sale of TML's Assets.

Soon after TML filed its bankruptcy petition on January 7, 1997, the Trustee filed his Motion to Hire Auctioneer for Sale of Property by Public Auction and for Payment of Secured Creditors (the "Sale Motion"), seeking authority to sell various items TML's personal property.[34] The Sale Order, which was signed by the court on March 6, 1997, directed the Trustee to hold "not less than $45,000" of the sale proceeds in an escrow account "to protect the interests of FMB–First Michigan Bank–Zeeland with respect to a certain secured Promissory Note executed jointly by the Debtor and a third party."[35] Exh. 15, ¶ 1.A.; Dkt. No. 51. The Sale Order further provided that:

> Word Investments reserves its right to buy the Note signed by Word Investments and the Debtor at any time and to subrogate to and/or take an assignment

---

**32.** De Graaf sent another notification to *both* BBC and TML on May 21, 1996. Exh. D.6.

**33.** Ajax operated its business on the lot adjacent to 607 Century. Exhs. U.4 and U.12.

**34.** The personal property the Trustee sought to sell under the Sale Motion included: assorted office equipment, furniture, desks, chairs, computers and cabinets; miscellaneous shop tools and equipment; miscellaneous repair parts and inventory; 4 forklifts; 30 semi-tractors; 155 trailers; 50 converters; and other remaining non-fixture personal property assets. Sale Motion, ¶ 4; Dkt. No. 25.

**35.** When the Sale Order was signed in March of 1997, FMB had two outstanding loans with TML. Tr. I at 63. The first of these loans was between FMB and TML, had a balance of approximately $45,000, and was secured by FMB's blanket lien on virtually all of TML's assets. Tr. I at 63. The second obligation arose from the renewed loading dock note that had been signed by both TML and Word. Tr. I at 63–64. This note also had a balance of approximately $45,000 as of the date of the Sale Order. Tr. I at 63–64.

The proceeds from the Trustee's sale of TML's personal property were sufficient to fully satisfy TML's obligations under the first loan and to establish the $45,000 escrow account. Stipulation of Facts, ¶ 15; AP Dkt. No. 83.

of FMB's rights under the Note and its security. If such payment is made, it shall be without prejudice to any rights the Trustee may have against FMB or Word and without prejudice to any rights Word Investment [sic] may have against the estate.

Exh. 15, ¶ 1.C.; Dkt. No. 51. Finally, the Sale Order required the Trustee to reimburse Word for the costs of cleaning and securing the property, to pay rent at the rate of $3,500 per month for the postpetition occupancy of the leased premises, and to vacate the premises by March 31, 1997. Exh. 15, ¶¶ 1.G., 1.H., and 1.J.; Dkt. No. 51.

### L. *The Assignment Agreement & The Sale of 607 Century.*

On April 30, 1997, Word and FMB executed an assignment agreement, under which Word agreed to pay FMB $44,489.22, the remaining balance on the loading dock renewal note. Exh. 22/J.2. Upon Word making this payment, "FMB convey[ed], assign[ed], and transfer[ed] to Word all of FMB's right, title, and interest" in the escrow account established by the court's Sale Order. Exh. 22/J.2, ¶ 1. FMB further assigned to Word all of its "right, title, and interest in the TML Real Estate Loan [i.e., the loan evidenced by the loading dock renewal note] and the Loan documentation described herein and more specifically described on the attached Exhibit A." Exh. 22/J.2, ¶ 3. Under the assignment agreement, the term "loan documentation" is defined to include the "Commercial Security Agreement dated September 15, 1988 [between FMB and Word]; a Real Estate Mortgage dated September 15, 1988 [against 607 Century], and such additional documents and agreements which are described on the attached

Exhibit A." Exh. 22/J.2, Recital of Facts. Exhibit A specifically identifies the security interests conveyed to Word under this provision. Exh. 22/J.2, ¶ 3. The list includes security agreements and financing statements, with dates ranging from July 9, 1985, to June 9, 1996, that created liens in favor of FMB on TML's equipment and other personal property. Exh. 22/J.2, ¶ 3; Exh. 23. The list does not include the mortgages, executed in conjunction with the loading dock and renewal notes, and held by FMB against Word's property at 607 Century. Exh. 22/J.2.

Paragraph two of the assignment agreement addresses FMB's mortgages against 607 Century in terms that seemingly contradict the other provisions of the agreement. Exh. 22/J.2, ¶ 2. That paragraph provides that, "[i]mmediately upon execution" of the assignment agreement, FMB would "execute and record a full and complete *discharge* of any mortgage, fixture financing statement, and any other document or interest to which FMB is a party effecting Word's real property located at 607 Century, SW, Grand Rapids, Michigan." Exh. 22/J.2, ¶ 2 (emphasis added).

The testimony of the attorneys for FMB and Word may be helpful in resolving the potential ambiguity created by the terms of the assignment agreement.[36] According to the testimony of FMB's attorney, the bank entered into this agreement intending simply to discharge the mortgage against the leased premises and to assign its interest in the escrow account to Word. Tr. I at 45. The attorney for Word testified that Word viewed the assignment agreement as a means of discharging the mortgage on the property so that it could

---

**36.** *See, e.g., UAW–GM Human Resource Ctr. v. KSL Recreation Corp.,* 228 Mich.App. 486, 579 N.W.2d 411 (1998) (when the terms of an agreement are unclear or ambiguous, the trier of fact may look to parol evidence to determine the intent of the parties).

go forward with the pending sale of the property. Tr. I at 83.

On June 18, 1997, FMB fulfilled its obligation under the assignment agreement and discharged its mortgages against the Word's property at 607 Century. Exh. 26/K.1 and K.2. That same day, Word sold 607 Century to Blyveis Real Estate for $575,000.[37] Exh. 25/U.9 and U.10.

Based upon the terms of the assignment agreement, as further explained by the testimony of the parties' respective counsel, the court finds that FMB's mortgages on 607 Century were discharged upon the signing of the assignment agreement on April 30, 1997. The assignment agreement devotes an entire, separate paragraph to the treatment of the mortgages, and provides that they are to be discharged, not assigned along with the FMB's other interests in the loading dock and renewal notes. The natural reading of the document is confirmed by the testimony of the parties' attorneys. Both explained and agreed that the assignment agreement was intended to discharge the mortgage. Accordingly, the court finds that FMB's mortgages on 607 Century were not assigned to Word pursuant to the assignment agreement.

## M. *The Expert Testimony and the Court's Calculations.*

The convoluted facts result in expert witnesses' testimony that seems confused or incomplete.

### 1. *Trustee's Expert.*

The Trustee's expert, Allan J. Rietberg ("Rietberg"),[38] attempted to approximate the fair market rental value of the leased premises by conducting a "market analysis." The object of Rietberg's market analysis was to determine how much rental income was being generated by assertedly comparable properties from January 1991 to January 1997. Tr. II at 169. Characterizing the loading dock addition as a "tenant improvement," [39] Rietberg essentially analyzed the leased property as if the loading dock had never been constructed and did not exist. Tr. II at 174; Tr. III at 13–14.

This initial assumption influenced Rietberg's opinion in two respects. First, Rietberg's failure to consider the loading dock reduced his estimate of the fair market rental value for the leased premises. Although he conceded that the addition of the loading dock transformed the leased premises into a "special use facility," i.e., a less than truckload ("LTL") truck terminal, Rietberg's analysis ignored the impact of the loading dock addition on the property. He therefore classified the leased premises as a "general purpose facility." Tr. II at 182–83; Tr. III at 8. As a result, the comparable properties Rietberg used in his analysis were limited to general purpose facilities. Tr. II at 169–70. Of

---

**37.** The Closing Statement indicates a purchase price of $575,000. Exh. 25/U.9. However, in his opening statement, counsel for Word stated that the sale price was ultimately adjusted to $603,750 to cover broker's commissions that were not provided for in the original purchase agreement. Tr. I at 12.

**38.** Rietberg has over twenty-five years of real estate experience and currently serves as the President of Rietberg Companies, a commercial industrial brokerage house located in Grandville, Michigan. Exh. X. Rietberg is a

certified appraiser, broker, and builder who holds many other designations and certifications. Exh. X; Tr. II at 165–66. The court accepted Rietberg as an expert witness in the field of real estate valuation based upon these qualifications. Tr. II at 168.

**39.** Rietberg explained that the loading dock appeared to be a "tenant improvement" because the base rent under the leases did not increase after the loading dock was constructed. Tr. II at 174; Tr. III at 10.

the ten comparable properties Rietberg considered in his analysis, not a single property may be properly classified as a LTL truck terminal. Tr. III at 14.

Rietberg's market analysis of comparable general purpose facilities shows lease rental rates of between $1.00 and $2.95 per square foot per year. Exh. X.1; Tr. II at 176–77. Based upon these comparable lease rates, the location of and condition of the leased premises, and the fact that the leased premises served as a trucking terminal, and therefore required a higher land-to-building ratio, Rietberg estimated the fair market rental value of the leased premises to be approximately $3.00 per square foot per year as of 1988. Exh. X.1.; Tr. II at 177–78. He adjusted this rate by three percent per annum to reflect COL increases for each year thereafter. Exh. X.1; Tr. II at 177–78. Accordingly, Rietberg's estimate of fair market rental value for the entire leased premises (22,499 square feet) was: $3.28 per square foot ($73,796.72 total) for 1991; $3.38 per square foot ($76,046.62 total) for 1992; $3.48 per square foot ($78,296.52 total) for

1993; $3.58 per square foot ($80,546.42 total) for 1994; $3.69 per square foot ($83,-021.31 total) for 1995; and $3.80 per square foot ($85,496.20 total) for 1996. Exh. X.3.

Second, by deeming the loading dock a "tenant improvement," Rietberg's analysis assumed that TML was only paying rent for the non-loading dock portions of the leased premises, i.e., 13,299 square feet.[40] This assumption greatly effects, and indeed skews, Rietberg's calculations regarding how much rent per square foot TML actually paid under the leases. Consequently, it also magnifies Rietberg's opinion of the amount by which TML's rent payments exceeded the fair market rental value of the leased premises.

Rietberg's report includes calculations of the annual rent paid by TML per square foot under the leases using both the full size of the buildings (22,499 square feet), and their size without including the loading dock square footage (13,299 square feet). His results are summarized as follows:

| Year | Total Rent Paid by TML per year | Rent Paid by TML per square foot per year (assuming 22,499 sq. ft.) | Rent Paid by TML per square foot per year (assuming 13,299 sq. ft.) |
|---|---|---|---|
| 1991 | $143,059.78 | $6.36 | $10.76 |
| 1992 | $153,022.74 | $6.80 | $11.51 |
| 1993 | $124,672.48 | $5.54 | $ 9.37 |
| 1994 | $117,610.43 | $5.23 | $ 8.84 |
| 1995 | $101,000.88 | $4.49 | $ 7.59 |
| 1996 | $ 63,729.34 | $2.83 | $ 4.79 |

Comparing these amounts to his estimate of the fair market rental value of the property, Rietberg calculated the rent "overcharge" under the leases as follows:

| Rent Paid by TML per square foot per year (as- | Rent Paid by TML per square foot per year (as- | Rietberg's Estimate of | Difference/ Overcharge per square foot per | Difference/ Overcharge per square foot per year |
|---|---|---|---|---|

---

40. The buildings on the leased premises occupied an area of approximately 22,499 square feet. Exh. X.2; X.3. Of this total amount, the loading dock occupied approximately 9,200 square feet. Exh. X.4; Tr. II at 173. Therefore, the non-loading dock buildings on the leased premises had an area of approximately 13,299 square feet.

| Year | suming 22,499 sq. ft.) | suming 13,299 sq. ft.) | Fair Market Rental Value | year (assuming 22,499 sq. ft.) | (assuming 13,299 sq. ft.) |
|---|---|---|---|---|---|
| 1991 | $6.36 | $10.76 | $3.28 | $3.08 | $7.48 |
| 1992 | $6.80 | $11.51 | $3.38 | $3.42 | $8.13 |
| 1993 | $5.54 | $ 9.37 | $3.48 | $2.06 | $5.89 |
| 1994 | $5.23 | $ 8.84 | $3.58 | $1.65 | $5.26 |
| 1995 | $4.49 | $ 7.59 | $3.69 | $0.80 | $3.90 |
| 1996 | $2.83 | $ 4.79 | $3.80 | ($0.97) | $0.99 |

Consistent with his overall assumptions, Rietberg testified that he believed the most relevant results were those calculated using 13,299 square feet. Tr. III at 35.

Rietberg's failure to consider the loading dock—both its impact on the property's "highest and best use" and its size—cause his market analysis to breakdown at two critical stages. First, Rietberg's estimate of fair market rent for the leased premises is erroneous because it does not account for the fact that the leased premises had a specialized use as a LTL trucking facility. In fact, Rietberg conceded that the "value in use" of the leased premises as a trucking terminal from 1991 to 1996 would have been higher than $3.00 per square foot per year. Tr. III at 15–16.

██ Notwithstanding the invalidity of Rietberg's estimates of the fair market rental value of the leased premises, his analysis goes further astray when he cal-

culates the amount of rent actually paid by TML without considering the loading dock square footage. The court believes a proper market analysis should not disregard 9,200 square feet simply because TML paid to build the improvement on that portion of the leased premises.[41]

Based upon the material flaws in Rietberg's market analysis, Rietberg's report and testimony will be given no weight in this court's determination of fair market rental value of the leased premises.[42]

### 2. Word's Expert.

Word's expert witness, DuWane Suwyn ("Suwyn"),[43] also conducted a market analysis in an attempt to determine the fair market rental rate for the leased premises from 1991 to 1996. Suwyn's analysis employed a much different approach than Rietberg's and yielded a dramatically different opinion.

[41] Given Word's participation in securing the loading dock financing from FMB and its obligation to reimburse TML for the cost of the loading dock construction through the $200,000 buyback at the end of the lease terms, whether the loading dock was a true "tenant improvement" is a valid question. However, because of the court's findings and conclusions, the question need not be answered. The court believes ignoring the existence of the loading dock distorts Rietberg's ultimate opinion.

[42] See Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984) ("When the testimony of a witness is not believed, the trier of fact may simply disregard it."); accord Duddy v. Kitchen & Bath Distribs., Inc.

(In re H.J. Scheirich Co.), 982 F.2d 945, 949 (6th Cir.1993).

[43] Suwyn is the President and CEO of Grubb & Ellis Paramount Properties in Grand Rapids, Michigan and has specialized in marketing industrial real property in western Michigan for approximately eleven years. Tr. III at 33; Exh. 34. Although Suwyn is not certified as an appraiser or broker, he is accredited through the Society of Industrial and Office Realtors and holds a CCIM designation. Tr. III at 33–34. Suwyn testified that, during his career, he has conducted seven to ten market analyses involving truck terminals and has been involved in two sales of truck terminals. Tr. III at 34–35. Based upon these qualifications, the court accepted Suwyn as an expert witness. Tr. III at 35.

Because Suwyn determined that the "highest and best use" of the leased premises for the time period from 1991 to 1996 was as a LTL truck terminal, the seven comparable properties used by Suwyn in his analysis were also all trucking terminals. Tr. III at 37–38. By using appropriate comparables, he was on the right track. However, the leases for five of the seven properties included in Suwyn's analysis were entered into after the 1994 lease was terminated (i.e., after 1996).[44] Noting that trucking facilities are "traditionally rented on a per-door basis," Suwyn reported the results of his market analysis in terms of fair market rental value per door. Tr. III at 41.

For the seven comparable properties used in Suwyn's analysis, the average rent paid was approximately $250 per door and the median rent paid was approximately $213 per door.[45] Exh. 34. Since the leased premises had forty-two doors, Suwyn estimated that the fair market rental value of the leased premises from 1991 to 1996 was approximately $10,500 per month.[46] Exh. 34.

■ The court finds that Suwyn's market analysis, and ultimate opinion, are also fatally flawed. As explained by one text, in a proper analysis of fair market rental

value, "[c]onditions of rent, time, location, and physical and income characteristics must be as similar as possible, or adjustments must be made for any dissimilarities." American Institute of Real Estate Appraisers, *The Appraisal of Real Estate,* 384 (8th ed.1983). This is where Suwyn's analysis fails. First, a majority of the comparable leases considered in Suwyn's analysis were executed well after the time period in question in this proceeding. Second, and much more importantly, nothing in Suwyn's written report or testimony indicates that any other factors, such as condition and age of the property, the surrounding neighborhood, the functionality of the doors, or the property's proximity to major highways, were considered in his analysis. The court is unwilling, and cannot, accept a simplistic "door counting methodology" as the sole basis to adequately form a valid opinion of the value of an LTL truck terminal.

Like Rietberg's opinion, Suwyn's analysis and ultimate opinion will be given no weight in the court's determination of fair market rental rates for the leased premises.[47]

3. *The Court's Determination of Fair Market Rental Value.*

■ In the absence of meaningful expert witness testimony regarding the fair

---

**44.** The leases used in Suwyn's analysis were dated May 1992, December 1994, September 1997, October 1999, "late 1999," May 2000, and September 2000. Exh. 34.

**45.** During cross-examination, Suwyn admitted that the rent amount for comparable property number six was misstated on his written report. Tr. III at 57. Thus, although his written report reveals an average lease price of $264 per door, the correct amount is approximately $250 per door. Exh. 34; Tr. III at 57–58. Similarly, the median lease price was approximately $213 per door instead of $269 per door as stated on Suwyn's written report. Exh. 34; Tr. III at 57–58.

**46.** In making these calculations, Suwyn did not assign any additional value for the 6,750 square foot free-standing truck service garage that also occupied a portion of the leased premises. Suwyn assumed that the fair market rent rate for the service garage would have been approximately $2.50 per square foot. Thus, he explained that leasing the service garage separately would add an additional $1,400 per month to his estimation of the fair market rental value of the leased premises. Exh. 34; Tr. III at 43–44.

**47.** *See Bose Corp.,* 466 U.S. at 512, 104 S.Ct. at 1966; *accord Duddy,* 982 F.2d at 949.

market rental value of the leased premises from 1994 through 1996,[48] the court is left with the difficult task of determining the fair market rental value of the leased premises based upon the record before it. However, there is one factor that is particularly helpful to the court in making this calculation: that is, the 1994 lease, if completed through its full term, gave TML an option to purchase the leased premises for $100,000. Exh. 13/C.3, ¶ 39(A) & (C). This potential purchase price is remarkable, given that the parties themselves estimated the value of the leased premises to be approximately $400,000 in 1994.[49]

The difference between the $400,000 value of the property and the $100,000 sale price offered to TML upon the expiration of the lease convinces this court that TML was paying more than fair market rental value for the leased premises each month in order to "build equity" toward the ultimate purchase of the leased premises.[50]

The 1994 lease required TML to pay a total of $885,818.88 over its 109 month term ($8,909.12 per month for 24 months and $8,000.00 per month for 84 months thereafter).[51] Of this amount, $300,000 must have been intended to build equity for TML's purchase of the leased premises. Consequently, $300,000 is the amount by which TML's total rent payments would have exceeded fair market rental value, had the lease remained in effect for its full term.

Allocating this $300,000 overpayment proportionally[52] over the entire term of the lease reveals that the fair market rental value of the leased premises (i.e., the amount of rent TML should have been paying) was approximately $5,891.87 per month for the first 24 months of the lease and $5,290.64 per month for the 84 months thereafter.[53] Had TML paid rent at these rates, the total rent it would have owed

48. The Michigan Uniform Fraudulent Conveyance Act has a "look-back period" of six years. The Trustee's fraudulent conveyance theory was first raised in his amended answer and counterclaim, filed on May 5, 2000, and does not relate back to the filing of his original answer and counterclaim. Therefore, the court's calculation of damages focuses on the rents paid from May 5, 1994, through the date the leases were terminated, December 12, 1996. *See infra* Part V.C.1.

49. The record contains no evidence to definitively establish the fair market sale value of the property from 1994 to 1996. Therefore, the court's analysis assumes that the sale value of the property was approximately $400,000 in 1994. This is the "estimated value" of the leased premises used by Word and TML in the negotiations that preceded execution of the 1994 lease. *See* Exh. Q.7.

50. Although the fair market rental value of the leased premises is related to the fair market value of the fee simple estate, the court recognizes that these values are not interchangeable. *See* American Institute of Real Estate Appraisers, *supra*, at 333 (the income capitalization approach is one method by

which appraisers attempt to convert a property's future ability to generate income into an indication of present market value). However, the record contains no evidence that would allow the court to translate from one value to the other. Without such evidence, the court has no choice but to reluctantly compare "apples to oranges" in its analysis.

51. Although the lease term was 109 months, the lease only called for 108 monthly rent payments. Exh. 13/C.3, ¶ 3(a). No rent was assessed for April, 1994. *Id.*

52. Because the 1994 lease required TML to pay higher rent for the first 24 months of the lease, the court has determined that the amount by which TML's actual rent payments exceeded fair market rental value was greater during the first two years of the lease term. Thus, instead of allocating the $300,000 overpayment evenly over the 109 month lease term, the court has allocated the overpayment in proportion to the amounts that were actually due throughout the life of the lease.

53. For the calculations used to arrive at these numbers, *see infra* Part IV.M.4.

Word over the actual term of the lease, May 1994 through December, 1996, would have been approximately $183,730.00 ($5,891.87 per month for 24 months and $5,290.64 per month for 8 months).[54]

Instead, the actual rent paid by TML from May 1994 to December 12, 1996 totaled $236,003.60: $71,273.38 for May through December 1994; $101,000.88 for 1995; and $63,729.34 for 1996. Exh. 32/S. The difference between the actual rent paid by TML over the term of the lease ($236,003.60) and the fair market rental value of the leased premises for that same time period ($183,730.00) is $52,273.60. Consequently, the court finds that $52,273.60 is the amount by which TML's rent payments exceeded the fair market rental value of the leased premises.[55]

### 4. *Calculation of TML's Excess Rent Payments.*

It is necessary to calculate fair market monthly rent amounts and the amount of TML's excess rent payments for each month of the lease term.

The amount of equity overpayment built into the total lease term:

$400,000 (estimated value of the leased premises) minus $100,000 (purchase price to be paid by TML under the purchase option) equals $300,000 (amount of "equity" to be built over term of lease—i.e., amount by which rent under the lease exceeded fair market rental value).

The total rent amount TML was obligated to pay over the entire term of the lease: 24 months times $8,909.12 per month equals $213,818.88; 84 months times $8,000.00 per month equals $672,000.00; $213,818.88 plus $672,000.00 equals a total of $885,818.88.

The fair market rental value of the leased premises (i.e., what rent rates *should have been* if not for the $300,000 equity-building overpayment): $885,818.88 minus $300,000.00 equals $585,818.88 (rent without overpayment over the entire term of the lease).

The calculation for the first 24 months of the lease is:

$213,818.88 (rent due in first 24 months) divided by $885,818.88 (total rent due under lease) equals X (fair market rent for first 24 months) divided by $585,818.88 (total fair market rent). Calculating this equation results in fair market rent for the first 24 months of $141,404.91.

$141,404.91 divided by 24 months equals $5,891.87 fair market rent per month for the first 24 months.

The calculation for the last 84 months of the lease is:

---

54. The lease was terminated on December 12, 1996, and no lease payments were required after that date, except this court's Sale Order required the Trustee to pay rent at the rate of $3,500 per month to Word for the postpetition occupancy of the leased premises and to vacate the leased premises by March 31, 1997. Exh. 15, ¶¶ 1.H, 1.J. The court's calculations do not account for these postpetition rents. *See supra* Part IV.K.

55. The court's analysis estimates the average annual fair market rental value of the leased premises from 1994 to 1996 to be approximately $68,018.28. According to Suwyn, who estimated the fair market rental value of the property to be approximately $126,000 per year (exclusive of the free-standing truck service garage), the fair market rent rates established by the court would be considered a steal. Rietberg's estimate, which would have placed the average fair market rental value of the leased premises at $83,021.31 from 1994 to 1996, is much closer to the court's calculation. However, as discussed *supra*, the court is unable to accept Rietberg's flawed methodology or his ultimate conclusions.

$672,000.00 (rent due in last 84 months) divided by $885,818.88 (total rent due under lease) equals X (fair market rent for last 84 months) divided by $585,818.88 (total fair market rent). Calculating this equation results in fair market rent for the last 84 months of $444,413.97.

$444,413.97 divided by 84 months equals $5,290.64 fair market rent per month for the last 84 months.

The rent owed by TML from May 1994 to December, 1996, at fair market rent rates:

24 months times $5,891.87 per month equals $141,404.88; 8 months times $5,290.64 per month equals $42,325.12; $141,404.88 plus $42,325.12 equals a total of $183,730.00.

The rent actually paid by TML from May, 1994 to December, 1996:

$71,273.38 (May, 1994 through December, 1994) plus $101,000.88 (rent paid from January through December, 1995) plus $63,729.34 (rent paid from January through December, 1996) equals $236,003.60 (total rent paid by TML under the lease).

The difference between the rent actually paid by TML and the fair market rental value of leased premises from May, 1994 to December, 1996:

$236,003.60 minus $183,730.00 equals $52,273.60.

## V. DISCUSSION

### A. Contribution Theory.

With the exception of the $44,489.22 paid by Word to FMB on April 30, 1997, all payments on the loading dock note and the renewal note were made by TML. Stipulation of Facts, ¶ 8. Based upon this payment history, and the assertion that Word and TML were "co-obligors" on the loading dock and renewal notes, the Trustee claims that TML's bankruptcy estate is entitled to recover one-half of the amounts TML paid on the notes from Word under the common law and statutory principles of contribution.[56] Word contends that it signed the notes as a surety and, as such, cannot be held liable for contribution under applicable law.

█ The loading dock and renewal notes executed by TML and Word constitute "negotiable instruments" under Michigan law. MICH. COMP. LAWS ANN. § 440.3104 (West 1994). Since TML and Word both signed each note, their relationship and rights under the notes are governed by Article 3 of Michigan's Uniform Commercial Code ("UCC").[57] MICH. COMP. LAWS ANN. § 440.3102(1) (West 1994). See Restatement (Third) of Suretyship & Guaranty § 4 cmt. a (1996) (Article 3 of the UCC applies to surety relationships where both the principal and secondary obligors are parties to the negotiable instrument; "[w]hen a suretyship relationship is governed by the Article 3 rules,

---

**56.** The Trustee recognizes that any potential recovery under the statutory contribution claim is limited by the applicable statute of limitations to those payments made by TML to FMB during the three years preceding the filing of TML's bankruptcy petition. MICH. COMP. LAWS ANN. § 440.3118(7) (West 1994). The Trustee's statutory contribution claim therefore applies to payments made by TML after January 7, 1994.

**57.** Article 3 of the Michigan UCC was amended effective September 30, 1993. The loading dock note was signed on September 15, 1988, and is therefore governed by the old Article 3. However, the renewal note was signed on November 12, 1993. Because the renewal note constituted a novation of the loading dock note and was signed after revised Article 3 became effective on September 30, 1993, the contribution claim will be analyzed under revised Article 3.

those rules take priority over the rules in this Restatement").

In support of his statutory contribution claim, the Trustee cites section 440.3116 of the Michigan UCC, which provides that two or more parties who have the same liability on an instrument are jointly and severally liable in the capacity in which they sign. MICH. COMP. LAWS ANN. § 440.3116(1) (West 1994). That section goes on to state that, "*[e]xcept as provided in section 3419(5) or by agreement of the affected parties,* a party having joint and several liability who pay [sic] the instrument is entitled to receive from any party having the same joint and several liability contribution in accordance with applicable law." MICH. COMP. LAWS ANN. § 440.3116(2) (West 1994) (emphasis added).

 Section 440.3419 of the Michigan UCC defines the characteristics and rights of a type of surety known under the UCC as an "accommodation party." [58] The statute states:

> [i]f an instrument is issued for value given for the benefit of a party to the instrument ("accommodated party") and another party to the instrument ("accommodation party") signs the instrument for the purpose of incurring liability on the instrument without being a direct beneficiary of the value given for the instrument, the instrument is signed

by the accommodation party "for accommodation."

MICH. COMP. LAWS ANN. § 440.3419(1) (West 1994). The question of whether Word qualifies as an "accommodation party" under this statutory definition will be dispositive of the Trustee's contribution claim, since the statute further states that "[a]n accommodated party who pays the instrument has no right of recourse against, and is not entitled to contribution from, an accommodation party." [59] MICH. COMP. LAWS ANN. § 440.3419(5) (West 1994).

 "Whether a person is an accommodation party is a question of fact." MICH. COMP. LAWS ANN. § 440.3419 cmt. 3 (West 1994). "A party opposing a contribution claim on the ground that he or she was an accommodation party has the burden of proving that status" by a preponderance of the evidence. 6 Anderson, *supra*, §§ 3–415:24; 3–415:29 (citing *Glimcher v. Reinhorn,* 68 Ohio App.3d 131, 587 N.E.2d 462, 466 (1991) (decided under former Article 3)).

 To satisfy the statutory definition, Word must establish that it was not the direct beneficiary of the note proceeds. This is a difficult task because there is no formula to distinguish between "direct" and "indirect" benefit. *See* 2 White & Summers, *supra*, § 16–11 ("It is plainly

---

**58.** Suretyship is "the relation which exists where one person has undertaken an obligation and another person is also under an obligation or other duty to the obligee, who is entitled to but one performance, and as between the two who are bound, one rather than the other should perform." *Restatement (First) of Suretyship & Guaranty* § 82 (1996). Under the UCC, the term "surety" includes all guarantors and all accommodation parties. 2 White & Summers, *Uniform Commercial Code,* § 16–10 (4th ed.1995). "A 'guarantor' differs from an 'accommodation party' only because the guarantor has added some words to its signature and has so altered ... the liability it would have had if it had simply put

its signature on the instrument as a mine-run accommodation party." *Id.*

**59.** Word's status as a potential accommodation party would not otherwise effect its liability on the note. 4 *Hawkland Uniform Commercial Code Series,* § 3–415:2. An accommodation party remains "liable to the holder according to the capacity in which [it] signed without regard to the fact that, with respect to the accommodated party, the accommodation party has a surety status." 6 *Anderson on the Uniform Commercial Code,* § 3–415:8 (3d ed.1998).

hard to say just what constitutes a direct benefit. The status of many cosigners of notes claiming accommodation party status will remain unpredictable as the courts continue to wrestle with this problem."). *See also* Neil B. Cohen, *Suretyship Principles in the New Article 3: Clarifications & Substantive Changes,* 42 Ala. L.Rev. 595, 600–1 (1991) (explaining that the distinction between direct and indirect benefit under revised Article 3 is "not always as obvious" as the UCC suggests).

 Under former Article 3, the Sixth Circuit Court of Appeals identified four factors to be considered in determining whether a party qualifies as an accommodation party. These factors are: (1) the location of the party's signature on the note, (2) the language of the note, (3) whether the party received any loan proceeds, and (4) the intent of the parties. *See First National Bank v. Rafoth (In re Baker & Getty Fin. Servs., Inc.),* 974 F.2d 712 (6th Cir.1992). Although the UCC definition of "accommodation party" has changed slightly since *Baker & Getty* was decided,[60] consideration of these factors remains appropriate under revised Article 3.

 With regard to the first factor, the signature of Word's representative appears on the second line reserved for the "borrowers' signatures" in the bottom right corner of the loading dock note. The location of the signature thus suggests that Word was a co-maker of the note and provides no indication that Word was signing the note as an accommodation party. *See Campo v. Maloney,* 122 N.H. 162, 442 A.2d 997, 1001–02 (1982) (when a promissory note indicates that the signatories are "jointly and severally liable as principals" and does not identify any individual signatory as an accommodation party, the trial court could rationally conclude that signatories were all principally liable under the note). However, it is common for an accommodation party to appear on a note as a co-maker, and the fact that a party signs the note as a maker does not preclude the conclusion that he is also an accommodation party. *See Godfrey State Bank v. Mundy,* 90 Ill.App.3d 142, 45 Ill.Dec. 549, 412 N.E.2d 1131, 1134 (1980); 2 White & Summers, *supra,* § 16–10.

Similarly, although both the loading dock note and the renewal note reference the loading dock agreement between TML and Word, neither note contains specific language indicating that Word should not be considered principally liable on the debt. Thus, this factor also favors the conclusion that Word was not an accommodation party to the loading dock and renewal notes.

The third *Baker & Getty* factor is much more important in analyzing and deciding the "direct benefit" inquiry under revised Article 3. Whether under the prior or current version of the statute, "one who receives the primary benefit from the instrument is not an accommodation party." *First Dakota Nat'l Bank v. Maxon,* 534 N.W.2d 37, 43 (S.D.1995). Conversely, "the fact that a party receives some benefit from the transaction does not disqualify the signer from being an accommodation party." 6 Anderson, *supra,* § 3–415:50. *See* MICH. COMP. LAWS ANN. § 440.3419 cmt. 1 (West 1994).

---

**60.** In *Baker & Getty,* the Sixth Circuit construed Ohio's version of former UCC 3–415, which defined an accommodation party as "one who signs the instrument in any capacity for the purpose of lending his name to another party to it." *See* OHIO REV. CODE ANN. § 1303.51 (repealed 1994). Revised Article 3's definition of accommodation party "discard[s] the perhaps chivalrous concept of lending one's name to another party" and "adopt[s] instead the economic concept of incurring liability without being a direct beneficiary of the value given for the benefit of another party." Cohen, *supra,* at 600.

The court determines that Word was not a "direct beneficiary" of the loading dock note. From the beginning, construction of the loading dock was based upon the request of TML and was to be paid for by TML. The loading dock agreement reflects this expectation by authorizing *TML* to "borrow up to $200,000 from any lender in order to finance construction" of the loading dock and providing that "all costs of construction shall be borne entirely by TML." Exh. 5/C.2, ¶¶ 1–2. The agreement required Word to "join in the execution of the mortgage for the *sole purpose* of subjecting its ownership interest in the premises to the lien of the mortgage and *to become liable as guarantor* under the provisions of any promissory note made by the lessee payable to the proposed lending institution . . . ." Exh. 5/C.2, ¶ 2 (emphasis added).

Further, and equally important, there is no evidence to suggest that any of the loading dock note proceeds were paid to Word. To the contrary, Word's attorney testified that Word never received the proceeds from the loan. Tr. I at 90. The Settlement Statement issued in conjunction with the loan indicates that the loan proceeds were to be paid into a "building escrow" account. Exh. A.6. TML, rather than Word, benefitted from the use of the loading dock in its business operations for approximately seven years after its construction.

This is not to suggest that Word may not have benefitted *indirectly* from the execution of the loading dock note and the subsequent construction of the loading dock. In practicality, the transaction required TML to bear the cost of building an improvement on the leased premises, thereby (presumably) increasing the value of property owned by Word. TML would only recognize the financial benefit of the additional value (in the form of the $200,000 buy-back) at the end of the previous pre–1994 lease.[61] Based upon the record, those benefits realized by Word as a result of the loading dock transaction do not constitute "direct benefits." Therefore, Word may properly claim its is an accommodation party under the loading dock and renewal notes.

Finally, the unambiguous intent of TML and Word, as demonstrated by the loading dock agreement, reinforces the court's conclusion that Word signed the loading dock note as an "accommodation party." *See Catania v. Catania,* 26 Conn.App. 359, 601 A.2d 543, 546 (1992) (citing *Kerney v. Kerney,* 120 R.I. 209, 386 A.2d 1100, 1102 (1978)) ("[t]he intention of the parties is an important factor to consider when determining accommodation status"). The parties' intent may be ascertained not only from face of the instrument, but also from the facts and circumstances surrounding the transaction.[62] *See First Dakota Nat'l Bank,* 534 N.W.2d at 41–42 (quoting *Campo,* 442 A.2d at 1001) ("Fact finders should focus on the intentions of the parties as reflected by the language of the pertinent instrument and by the surrounding circumstances.") (internal quotation marks

---

61. Reiterating, when the 1994 lease became effective, the terms were modified to permit TML to purchase the leased premises for $100,000 at the end of the lease term if certain conditions were met. As discussed in greater detail *infra* Parts V.C.2.b. and c., the likelihood of TML ever satisfying the conditions was negligible.

62. The intent to serve as an accommodation party must be shown to exist at the time when the instrument was signed. 6 Anderson, *supra,* § 3–415:45. Although the 1994 lease contains language relating to the obligations of the parties under the notes, it was executed after both the loading dock and renewal notes. Consequently, the 1994 lease is not relevant to the present analysis.

omitted). An express agreement or implied understanding between the parties may establish the accommodation status of one of the parties. *See Federal Land Bank v. Taggart,* 31 Ohio St.3d 8, 508 N.E.2d 152, 156 (1987); 4 Hawkland, *supra,* § 3–415:3.

In this instance, the facts and circumstances—including both the testimony of the parties and the September 1988 loading dock agreement itself—indicate unequivocally that Word incurred liability under the loading dock and renewal note "for the benefit" of TML. *See* MICH. COMP. LAWS ANN. § 440.3419(1) (West 1994). De Graaf credibly testified that, when TML asked Word to finance the proposed loading dock addition directly, Word declined to do so. Tr. II at 110–11. Instead, at TML's request, Word agreed to assist TML in procuring outside financing to fund the project. Tr. II at 111. The parties then formalized their understanding in the loading dock agreement. Under the loading dock agreement, "all costs of construction [were to] be borne entirely by TML." Exh. 5/C.2, ¶ 2. Word's role in the transaction was to "join in the execution of the mortgage for the *sole purpose* of subjecting its ownership interest in the premises to the lien of the mortgage and *to become liable as guarantor* under the provisions of any promissory note made by the lessee payable to the proposed lending institution . . . ." Exh. 5/C.2, ¶ 2 (emphasis added).

Word was not the direct beneficiary of the loading dock or renewal note. To the contrary, the parties executed the notes with the intention and the understanding that Word's role was that of a surety. The court therefore concludes, by a preponderance of the evidence, that Word was an accommodation party to the loading dock and renewal notes. Consequently, TML is not entitled to contribution from Word under section 440.3116(2) of the Michigan UCC.

Because Word is an accommodation party, it is entitled to reimbursement or indemnification from TML for the $44,489.22 it paid to FMB in satisfaction of the loading dock renewal note.[63] Section 440.3419 of the Michigan UCC provides that "[a]n accommodation party who pays the instrument is entitled to reimbursement from the accommodated party and is entitled to enforce the instrument against the accommodated party." MICH. COMP. LAWS ANN. § 440.3419(5) (West 1994). The payment of the underlying debt by an accommodation party does not discharge the paper, nor does it relieve the accommodated party from liability under the note. 6 Anderson, *supra,* § 3–415:162. *See also Great Western Bank v. Kong,* 90 Cal. App.4th 28, 108 Cal.Rptr.2d 266, 269 (2001) (under California's version of the UCC, when a surety or guarantor pays the debt, the obligation is not automatically extinguished; "[r]ather, the surety or guarantor can maintain an action on the original obligation against the party primarily liable for its payment"). Word is therefore entitled to receive the amount it paid FMB from the remaining sale proceeds that the Trustee is holding in the estate's account.

### B. *Merger Theory.*

▮▮ The fact that FMB assigned its rights to Word upon receiving the final

---

**63.** A surety who satisfies a debt for which another party is principally liable has two rights of recovery against the primary debtor: subrogation and reimbursement. 2 White & Summers, *supra,* § 16–10. "The surety's right of subrogation is its equitable right to assert the rights of the creditor against the debtor." *Id.* "Indemnification is merely the object of subrogation." 4 Hawkland, *supra,* § 3–415:160. In contrast, "the surety's right of 'reimbursement' does not . . . depend upon the rights of the creditor; rather it rests upon the debtor's express or implied promise to indemnify the surety or upon grounds of unjust enrichment." 2 White & Summers, *supra,* § 16–10.

payment on the loading dock renewal note only reinforces Word's right to obtain reimbursement from TML. As explained by one commentator:

> When the accommodation party has paid the holder the amount of the paper, it may be desirable for the accommodation party to obtain an assignment of rights from the holder. *Theoretically, it should not make any difference whether the accommodation party claims by way of subrogation or by an express assignment.* The latter may have some practical advantage in simplifying proof or local procedural variations may exist.

6 Anderson, *supra*, § 3–415:157 (citing *Anna Nat'l Bank v. Wingate*, 63 Ill.App.3d 676, 21 Ill.Dec. 84, 381 N.E.2d 19 (1978)) (emphasis added).

The Trustee argues that Word is not entitled to exercise its rights of reimbursement or subrogation against TML based on the common law doctrine of merger of estates. Specifically, the Trustee asserts that, by Word taking an assignment of FMB's rights with regard to the loading dock note, Word acquired a mortgage (a lesser estate in land) which encumbered property it already owned in fee simple absolute (the greater estate in land). Thus, the Trustee claims that a merger of estates occurred, extinguishing both the mortgage *and* the debt it secured. The Trustee's theory misconstrues the assignment agreement between FMB and Word (and the rights that were assigned thereunder), and confuses the merger doctrine in an attempt to displace general subrogation principles.

■ The general principle of merger of estates can be stated as follows: when a single person holds both a dominant and a servient estate in the same piece of real property, the lesser estate will merge into the greater estate unless a reason exists for keeping them separate. *See Anderson v. Thompson*, 225 Mich. 155, 159, 195 N.W. 689, 690 (1923) ("There is no doubt about the general rule that when the holder of a real estate mortgage becomes the owner of the fee, the former estate is merged in the latter."); *Winans v. Wilkie*, 41 Mich. 264, 1 N.W. 1049 (1879) (applying merger doctrine where owner of property, who assumed indebtedness of a mortgage debt, later took an assignment of the mortgage). Before the modern recording system, the doctrine of merger was frequently invoked to "serve the nonsubstantive purpose of simplifying property titles." *Restatement (Third) of Property: Mortgages* § 8.5 cmt. c (Tentative Draft No. 5, 1996). *See* Ann M. Burkhart, *Freeing Mortgages of Merger*, 40 Vand. L.Rev. 283, 288–303 (discussing the historical development of the merger doctrine).

■ Paragraph 2 of the assignment agreement provided that FMB's mortgages against 607 Century were to be discharged. Although the assignment agreement is somewhat ambiguous, and despite the fact that FMB did not actually execute the discharge of mortgage contemporaneously with the assignment agreement, this court has made an explicit finding that the mortgage was discharged upon the execution of the assignment agreement. *See supra* Part IV.L. Word never simultaneously held title and FMB's mortgage interest in the property. Under the facts of this case, there was no opportunity for merger of estates to occur. The Trustee's merger argument fails.[64]

---

64. Even assuming the facts were different and Word held both title and the assigned mortgage from FMB, as a matter of law, the proper application of the doctrine of merger does not affect Word's right to receive reimbursement as an accommodation party pursuant to the note. Because it is intended to serve primarily as a title clearing device, "merger is

## C. *Fraudulent Conveyance Theory.*

As his last counterclaim, the Trustee asserts that the rent charged under terms of the lease exceeded the fair market rental value of the leased premises; to the extent each rent payment [65] from TML to Word exceeded fair market rental value of the leased premises, it should be avoided as a constructive fraudulent conveyance under Michigan law.[66] The Trustee's fraudulent conveyance claim is based upon section 544(b), which gives the Trustee the right to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law" by a unsecured creditor holding an allowed claim.

In this instance, the "applicable law" upon which the Trustee relies is the Michigan Uniform Fraudulent Conveyance Act (the "UFCA").[67] MICH. COMP. LAWS

---

absolutely inapplicable to the debt aspect of the mortgage transaction." Burkhart, *supra,* at 369. "Merger is completely inapplicable to issues of personal liability for an obligation because merger is designed solely to serve the nonsubstantive purpose of simplifying property titles.... The continued existence of the mortgage lien, however, is irrelevant to the issue of personal liability on the obligation, as demonstrated by the availability of a deficiency judgment after a mortgage has been foreclosed and thereby extinguished." *Restatement (Third) of Property: Mortgages* § 8.5 cmt. c. (Tentative Draft No. 5, 1996).

Once an underlying debt is paid, the mortgage lien is extinguished—a result not mandated by the merger doctrine, but by well-established common law and UCC principles. *See Boyd v. Old Kent Bank (In re Spaniak),* 221 B.R. 732, 735 (Bankr.W.D.Mich.1998) (UCC "codifies the common law rule that a lien does not exist apart from the obligation or debt that it secures".) If the debt is paid by one who is primarily obligated to pay, the payor may not enforce the debt against a third party after such payment. *Michigan Hospital Serv. v. Sharpe,* 339 Mich. 357, 373, 63 N.W.2d 638, 641 (1954) (the result is dictated by basic subrogation principles, which provide that one who is primarily liable for a debt cannot be subrogated to the lender's rights under the note or mortgage securing the debt). However, when one is secondarily liable, e.g., an accommodation party under the UCC, the fact that the debt was paid by that party, whether or not the debt was secured by a mortgage, will not extinguish the underlying debt, nor will it discharge the liability of the party primarily liable, e.g., an accommodated party under the UCC. *See Great Western Bank,* 108 Cal.Rptr.2d at 269.

The UCC specifically entitles an accommodation party (such as Word) to obtain reimbursement from the accommodated party

(such as TML) regardless of whether the accommodation party took a formal assignment of the lender's (such as FMB) position. MICH. COMP. LAWS ANN. § 440.3419(5) (West 1994). Therefore, even if Word had title and was assigned the mortgage to the leased premises, the Trustee's merger argument would be rejected by the court.

**65.** The Trustee does not argue that entering into the lease constituted a fraudulent conveyance. Rather, he contends that each rent payment from TML to Word should be deemed a constructively fraudulent conveyance to the extent that it exceeded the fair market rental value of the leased premises. This approach is consistent with rationale that has been employed by several courts in determining when debts were incurred for purposes of preference actions under § 547. As explained by one court:

> The court declines to follow the rationale advanced by the trustee that the debt was incurred at the time of the original signing of the lease obligations. The total lease obligation, at that point in time was not due and payable—it was only due and payable as the lease term progressed and as the lessee occupied the premises subject to the leasehold in accordance with the terms of the lease.

*Bernstein v. RJL Leasing (In re White River Corp.),* 799 F.2d 631, 632–33 (10th Cir.1986) (quoting *Carmack v. Zell (In re Mindy's Inc.),* 17 B.R. 177, 179 (Bankr.S.D.Ohio 1982)).

**66.** The Trustee has not raised any allegations of actual fraud in this adversary proceeding.

**67.** Effective December 30, 1998, Michigan replaced the UFCA with the Uniform Fraudulent Transfer Act (the "UFTA"). *See* MICH.

ANN. § 566.11–566.23 (West 1996) (repealed 1998). The UFCA provides in pertinent part that:

> [e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

MICH. COMP. LAWS ANN. § 566.14 (West 1996) (repealed 1998). The parties have stipulated that TML was insolvent from January 7, 1991 to January 7, 1997. Stipulation of Facts, ¶ 19. Therefore, the only question remaining is whether TML received "fair consideration" in exchange for its monthly rent payments under the leases.

### 1. *The Look–Back Period.*

As a preliminary matter, the court must determine the time period to which the Trustee's fraudulent conveyance claim applies. Michigan's version of the UFCA is applicable to "transfers made within the six years preceding the date an action is brought to avoid them." *Borock v. Telesz (In re Ventimiglia)*, 198 B.R. 205, 210 (Bankr.E.D.Mich.1996). *See* MICH. COMP. LAWS ANN. § 600.5813 (West 1996).

Although the Trustee's original answer and counterclaims were filed on July 15, 1998, the Trustee's fraudulent conveyance claim was *first* raised in his amended answer and counterclaim, filed on May 5, 2000. Consequently, Word asserts that, for purposes of the six year "look-back period," the Trustee's action was filed on May 5, 2000. The Trustee argues that his fraudulent conveyance claim "arises out of the same nucleus of operative facts ... relating to the entire financial relationship between Word and [TML]" as the theories asserted in his original answer and counterclaims. Therefore, he contends that the fraudulent conveyance claim should be deemed to relate back to the filing date of the original answer and counterclaims under FED. R. BANKR. P. 7015(c).

Rule 7015(c) provides that "[a]n amendment of a pleading relates back to the date of the original pleading when ... the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." FED. R. BANKR. P. 7015(c)(2). Under this rule, an amended pleading containing a new legal theory may be deemed to "relate back" to the original pleading so long as the new claim "arises out of the same transaction or occurrence." *Miller v. American Heavy Lift Shipping*, 231 F.3d 242, 248 (6th Cir.2000). However, even if the new theory will lead to the same result, e.g. avoidance of the transfer, an amendment cannot relate back if different facts are essential to reach that conclusion. *Coan v. Meryl Diamond, Ltd. (In re Gantos, Inc.)*, 283 B.R. 649 (Bankr. D.Conn.2002) (the trustee's amended complaint, which sought to avoid transfer as a constructive fraudulent conveyance, did not relate back to the filing of original complaint, which sought to avoid the same transaction as a preferential transfer).

---

COMP. LAWS ANN. § 566.31–566.43 (West 1996 & Supp.2002). Although the UFTA requires "reasonably equivalent value" instead of "fair consideration" in exchange for transfers by an insolvent, "in substance these terms have the same meaning." *Webster v. Barbara (In re Otis & Edwards, P.C.)*, 115 B.R. 900, 908 (Bankr.E.D.Mich.1990). Because the transfers at issue in this adversary proceeding occurred prior to 1998, and since the outcome of the fraudulent conveyance analysis will be substantially similar under both statutes, the court will apply the UFCA in this instance. During opening arguments, the court stated that it would likely apply the UFCA, and the parties did not object. Tr. I at 32.

 The eight counterclaims asserted by the Trustee in his original answer were based upon many different aspects of the parties' financial relationship, from the 1988 loading dock agreement (breach of contract and unjust enrichment claims) to Word's purchase of FMB's secured claim (merger and equitable subordination claims). However, none of the original counterclaims involved factual questions of the fair market rental value of the leased premises during the prepetition period. The Trustee's fraudulent conveyance claim requires consideration of facts that are materially different than those asserted in the original answer and counterclaims, and Word could not have anticipated defending such a claim based upon the original pleading. *See Miller*, 231 F.3d at 252 (Guy, J., dissenting) ("The rationale behind [Rule 7015(c)] is to allow relation back when the defendant has been put on notice, through the pleadings or other sources, of the entire scope of the transaction or occurrence."). Therefore, the Trustee's amended counterclaim does not relate back for purposes of calculating the relevant "look-back period," and the transfers subject to the avoidance under the Trustee's fraudulent conveyance theory are those that occurred after May 5, 1994.[68]

### 2. Fair Consideration.

 The UFCA indicates that fair consideration is received:

(a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or;

(b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained.

¶ 21. TML filed its chapter 7 petition on January 7, 1997. The Trustee's original counterclaim was filed on July 15, 1998, well within § 546(a)'s two year requirement.

The statute of limitations in § 546 is not jurisdictional and may be waived by the parties. *Cf. Bartlik v. United States Dept. of Labor*, 62 F.3d 163 (6th Cir.1995) (en banc) (holding that the "application of [Federal Rule of Appellate Procedure] 26(a), and likewise its counterpart [Federal Rule of Civil Procedure] 6(a), to calculate a limitations period does not 'expand' or 'enlarge'" the court's jurisdiction). Although *Bartlik* does not directly address § 546 or FED. R. BANKR. P. 9006(a), it effectively overrules *Martin v. First Nat'l Bank of Louisville (In re Butcher)*, 829 F.2d 596 (6th Cir.1987) (holding that § 546(a) was "jurisdictional" and could not be enlarged by application of procedural rules governing time deadlines). *See also Pugh v. Brook (In re Pugh)*, 158 F.3d 530 (11th Cir. 1998) (§ 546(a) is a waivable statute of limitation and not a bar to jurisdiction). Therefore, pursuant to the parties' factual stipulation, the Trustee's fraudulent conveyance claim was timely filed for purposes of § 546(a).

**68.** In its trial brief, Word argued that the Trustee's fraudulent conveyance claim, which was raised for the first time in the Trustee's amended answer and counterclaim on May 5, 2002, was filed more than two years after the petition date and thus should be barred by the statute of limitations set forth in § 546(a). Section 546(a) provides that:

An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of—
(1) the later of—
(A) 2 years after the entry of the order for relief; or
(B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or
(2) the time the case is closed or dismissed.
11 U.S.C. § 546(a). However, one of the Stipulated Facts submitted by the parties states that "the May of 2000 filing date of the amended counterclaim relates back to the filing of the original counterclaim for purposes of 11 U.S.C. § 546(a)." Stipulation of Facts,

MICH. COMP. LAWS ANN. § 566.14 (West 1996) (repealed 1998). Fair consideration "does not require absolute equivalence between the property the grantor gives up and what he receives in return; there is room for some inequality." *Allard v. Flamingo Hilton (In re Chomakos)*, 170 B.R. 585, 593–94 (Bankr.E.D.Mich.1993), *aff'd*, 69 F.3d 769 (6th Cir.1995) (quoting Peter A. Alces, *Law of Fraudulent Transactions*, § 502(2)(b)(i), 5–59 (1989)). To the contrary, the statute seeks to strike a "balance between the need to permit transactors to make deals, some good and some not so good, and the need to fix a point beyond which courts will not permit grantors to enter into transactions that will too profoundly impair their ability to discharge obligations to creditors." *Id.*

In determining whether "fair consideration" was given in exchange for a transfer, the court must look to the "totality of circumstances" surrounding the transaction. *See Official Unsecured Creditors Comm. v. Oak Park Village Ltd. Partnership (Matter of Long Dev., Inc.)*, 211 B.R. 874, 881–82 (Bankr.W.D.Mich. 1995), *aff'd*, 117 F.3d 1420, 1997 WL 377055 (6th Cir.1997). The court may consider some or all of the following factors in its determination of whether the "fair consideration" requirement has been satisfied: (1) whether the transaction was conducted at arms-length; (2) whether property or value was transferred to the debtor as a result of the transaction; (3) whether the debtor received additional valuable benefits as a result of the transaction; (4) whether the debtor was rendered "execution proof" as a result of the transaction; and (5) whether the transaction was made in "good faith." *See Matter of Long Dev., Inc.*, 211 B.R. at 881–82 (citing *In re Chomakos*, 170 B.R. at 593–94; *Boyd v. Sachs (In re Auto Specialties Mfg. Co.)*, 153 B.R. 457, 498 (Bankr.W.D.Mich.1993); *In re Otis & Edwards, P.C.*, 115 B.R. at 909).

### a. *Arm's–Length Transaction.*

A transaction is characterized as having been made at "arm's length" if it was "negotiated by unrelated parties, each acting in his or her own self interest." *Black's Law Dictionary* 109 (6th ed.1990). The results of an arm's length transaction form the "basis for a fair market value determination." *Id.*

Based upon the facts and circumstances of this adversary proceeding, it is difficult to discern whether the 1994 lease was negotiated and executed at arm's length. As evidenced by the correspondence between the parties, the 1994 lease was negotiated extensively for more than three years. However, during this negotiation period, De Graaf, as President of Word, and TML were not completely unrelated. For example, De Graaf served on the TML Board of Directors for approximately six months, from January 7, 1993 to July 12, 1993, while lease negotiations were ongoing. Exh. M; Tr. II at 117–18. TML also executed a $30,000 promissory note personally payable to De Graaf during this time period. Exh. O.3.

Notwithstanding this somewhat inconclusive evidence regarding the parties' relationship during the lease negotiation period, the *terms* of the 1994 lease suggest that the transaction was not negotiated at arm's length. As noted above, the 1994 lease required TML to pay rent at rates that far exceeded the fair market rental value of the leased premises. These rent overpayments were designed to accumulate over the nine year term of the lease and to eventually facilitate TML's purchase of the leased premises for the "bargain" price of $100,000. However, this purchase option was conditioned upon TML: (1) timely paying all rent due under the lease throughout the lease term, (2)

timely repaying its promissory note *to De Graaf,* and (3) complying with all obligations to FMB under the loading dock and renewal note. Exh. 13/C.3, ¶ 17(A). The rent rates under the lease exceed the fair market rental value of the leased premises and the lease terms are not consistent with the terms one might usually expect to find in normal, arm's length commercial leases.

### b. *Value Transferred to the Debtor.*

As discussed in the court's calculation of the fair market rental value of the leased premises above, *see* Part IV.M.3., the terms of the 1994 lease required TML to pay a rent "premium" each month. In exchange for this premium, TML received the illusory expectancy that the value it paid to Word would ultimately be reciprocated when it exercised its purchase option at the conclusion of the nine year lease term. The "value" TML received from such a hopeless arrangement was disproportionately small as compared to the above-market rent rates TML was paying under the 1994 lease. Consequently, this factor strongly suggests that the requirement of "fair consideration" was not met under the circumstances of the 1994 lease transaction.

Statements made by De Graaf himself (referring to the original leases, but equally applicable to the 1994 lease), confirm this court's conclusion that TML's rent payments to Word exceeded the fair market rental value of the leased premises. In his letter to the Grand Rapids' City Assessor's Office, dated November 16, 1989, De Graaf referred to the original leases as "generous" and admitted that "the lease income bears little relationship to the value of the property." Exh. 5.

### c. *Additional Benefits to the Debtor.*

Word argues that the benefits TML received under the 1994 lease extended well beyond the right to use and occupy the leased premises. Word's primary contention is that the lease afforded TML the option to purchase the leased premises for $100,000, even though the fair market value of the property was at least four times that amount. In its trial brief, Word correctly states that the value of this purchase option should be measured as of the date the 1994 lease was executed and that the court should disregard the fact that, due to TML's numerous defaults, the option was never exercised. *See Allard v. Flamingo Hilton (In re Chomakos),* 69 F.3d 769, 771 (6th Cir.1995) ("The time that counts is not the time when the bet is won or lost, but the time when the bet is placed."). However, even when the 1994 lease was executed, the prospect of TML complying with the lease terms and ultimately realizing the value of this purchase option was illusory. De Graaf himself conceded that, prior to 1994, TML had never been current in its rent payments. Tr. II at 113. Aside from TML's agreement to the new lease terms (which seemed to suggest that it believed it could make payments at the rates set forth in the 1994 lease), there is no evidence to suggest that TML's prior inability to timely pay would change after the 1994 lease was executed. Consequently, the purchase option did not benefit TML in any real sense.

Word also claims that it provided significant benefits to TML by co-signing the loading dock and renewal notes and subjecting its property to FMB's mortgage, thus facilitating construction of the loading dock on the leased premises. While TML did benefit from the use of the loading dock throughout its occupancy of the leased premises, it also bore the entire cost of the loading dock's construction. Word was only an accommodation party. *See supra* Part V.A. In practicality, the

loading dock agreement required TML to pay a mortgage debt to build Word's equity in the property. TML would only realize the possible financial benefit of the additional value at the conclusion of the lease—either through the original $200,000 buy-back or the later $100,000 purchase option. As discussed at length above, TML's prospect of actually realizing any added value through either of these options was chimerical. Once again, any overall "benefit" TML received from this arrangement was negligible.

Finally, Word points to several other alleged "benefits" TML received under the leases: Word declined to default or evict TML even though TML was constantly behind in its rent payments, it consistently accepted late rent payments and worked with TML to correct rent and tax arrearages, and it didn't impose COL rent increases for the years 1992, 1993, and 1994 even though it was entitled to do so. Under the circumstances, however, one cannot conclude that Word engaged in these activities in a kind-hearted attempt to provide added "benefits" to an ailing, insolvent tenant. It is much more probable that Word pursued this course of action so that it could continue to receive financial benefit, if not always the *full* potential benefit, from a very lucrative, above-market lease. The court believes that Word could not re-let the leased premises on terms comparable to those it had with TML. Likely sharing such a belief, and acting in its financial self-interest, Word did everything it could to keep the TML lease alive.

### d. *"Execution Proof."*

Given the overall facts of this case, whether TML was rendered "execution proof" as a result of the 1994 lease is not very relevant to the court's analysis. The court notes, however, that to the extent TML's monthly rent payments to Word exceeded the fair market rental value of the leased premises, those excess payments diminished assets that would otherwise have been available to satisfy the claims of TML's creditors. Thus, while the transfers did not necessarily render TML "execution proof," they did hinder a creditor's ability to execute on a prospective judgment against TML.

### e. *"Good Faith" Transaction.*

 The UFCA's definition of "fair consideration" specifically references the term "good faith." MICH. COMP. LAWS ANN. § 566.14 (West 1996) (repealed 1998). "Good faith" is also a factor to be considered in evaluating the "adequacy of the consideration under the 'totality of circumstances' test." *See Matter of Long Dev.*, 211 B.R. at 885. The "primary orientation" of the good faith inquiry is "whether the transferee knowingly participated in acts or as a part of a plan to hinder or defraud creditors." *In re Chomakos*, 170 B.R. at 594.

Simply stated, Word's purpose in executing the lucrative 1994 lease was to make money to fund its activities. There is no evidence to indicate that Word ever knowingly or intentionally acted to the detriment of TML's other creditors.

### f. *Summary.*

 After carefully weighing the foregoing factors, the court concludes that TML did not receive fair consideration in exchange for the above market rent it paid Word under the 1994 lease. Aside from the use of the leased premises, the only "benefit" TML received under either of the leases was the illusory opportunity to receive a $200,000 buy-back or to exercise an option to purchase the leased premises at a $100,000 bargain price, and the right to build (and pay for) a loading dock on Word's property. The resulting inequality

of benefits is sufficient to transform the 1994 lease transaction (and the excess rent payments made thereunder) from a "bad deal" for TML into a constructively fraudulent conveyance, rather than a "great deal" to Word. By a preponderance of evidence,[69] the court holds that Word received a fraudulent conveyance to the extent that TML made excess rent payments.

### 3. Trustee's Burden of Proof.

The Michigan Supreme Court has not explicitly stated the standard of proof to be applied in constructive fraud cases. Nor can the governing standard be discerned by reference to general fraud cases decided under Michigan law. As the Michigan Court of Appeals recently explained:

> [w]e are unable to say with any degree of certainty exactly what standard of proof courts should apply in fraud cases. The [Michigan] Supreme Court has alternately required fraud to be established by a preponderance of the evidence and by clear and convincing proof, with little consistency and no detailed analysis.

*Allstate Ins. Co. v. Maroki*, No. 230051, 2002 WL 31117182, at *2 (Mich.Ct.App. 2002) (citing *Mina v. General Star Indem. Co.*, 218 Mich.App. 678, 684–85, 555 N.W.2d 1, 4 (1996) *rev'd on other grounds*, 455 Mich. 866, 568 N.W.2d 80 (1997)).

Where, as here, "the state's highest court has not decided the applicable law, then the federal court must ascertain the state law from 'all relevant data.' " *Vogel v. Kalita (In re Kalita)*, 202 B.R. 889, 901 (Bankr.W.D.Mich.1996) (quoting *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir.1995)

(citations omitted)). The "relevant data" to be considered includes state appellate court decisions, "Supreme Court dicta, restatements of law, law review commentaries, and the majority rule among other states." *Garden City*, 55 F.3d at 1130; *Strong v. Page (Matter of Page)*, 239 B.R. 755, 763 (Bankr.W.D.Mich.1999).

In order to prevail on a claim of *actual* fraud under the Michigan UFCA, the plaintiff must be able to establish the existence of fraud by clear and convincing evidence. *See Matter of Long Dev.*, 211 B.R. at 886 (citing *United States v. Rode*, 749 F.Supp. 1483, 1493 (W.D.Mich.1990) *aff'd*, 943 F.2d 53, 1991 WL 167159 (6th Cir.1991)). This requirement parallels the rule in other states, many of which require actual fraudulent conveyances to be established by clear and convincing evidence. *See Litchfield Asset Mgmt. Corp. v. Howell*, 70 Conn.App. 133, 799 A.2d 298, 306 (2002); *Gifford–Hill & Co., Inc. v. Stoller*, 221 Neb. 757, 380 N.W.2d 625, 630 (1986); *McKinley Fed. Sav. & Loan v. Pizzuro Enterprises, Inc.*, 65 Ohio App.3d 791, 585 N.E.2d 496, 499 (1990); *Bradford v. Bradford*, 993 P.2d 887, 892 (Utah Ct.App.1999). *But see Gagan v. Gouyd*, 73 Cal.App.4th 835, 86 Cal.Rptr.2d 733, 735 (1999) ("In determining whether transfers occurred with fraudulent intent, we apply the preponderance of the evidence standard."); *Morris v. Nance*, 132 Or.App. 216, 888 P.2d 571, 576 (1994) (same).

The burden of proof to be applied in *constructive* fraud cases, however, is not so clear. Courts applying Michigan law have alternatively required constructive fraud to be proven by a preponderance of the evidence or clear and convincing evidence. *Compare In re Ventimiglia*, 198

---

**69.** *See* discussion regarding the burden of proof *infra* Part V.C.3. If the proper burden is

clear and convincing evidence, the result would very likely be different.

B.R. at 210 (in constructive fraud cases under the Michigan UFCA, the plaintiff "has the burden of proving lack of fair consideration by a preponderance of the evidence") (citing *In re Otis & Edwards, P.C.*, 115 B.R. at 910–11 (placing the burden of proof on plaintiff in constructive fraud case, but never identifying the applicable standard)) *with Foodland Distribs. v. Al–Naimi*, 220 Mich.App. 453, 481, 559 N.W.2d 379, 391 (1996) (O'Connell, J., concurring) ("As with other claims of fraud, [constructive] fraudulent conveyances ... must be proved by clear and convincing evidence.") (citing *Rode*, 749 F.Supp. at 1493 (actual fraud case)). Courts in other states appear to be similarly divided regarding the applicable standard. *Compare Bay State Milling Co. v. Martin (In re Martin)*, 145 B.R. 933, 946 (Bankr.N.D.Ill. 1992) (under Illinois law, elements of constructive fraud need only be proven by a preponderance of evidence) *and Clearwater v. Skyline Constr. Co., Inc.*, 67 Wash.App. 305, 835 P.2d 257, 266 (1992) (under Washington law, constructive fraud must be proven by "substantial evidence") *with Gaudio v. Gaudio*, 23 Conn.App. 287, 580 A.2d 1212, 1223–24 (1990) (under Connecticut law, constructive fraud must be proven by clear and convincing evidence) *and Territorial Sav. & Loan Ass'n v. Baird*, 781 P.2d 452, 458 (Utah Ct.App. 1989) (under Utah law, elements of constructively fraudulent conveyance must be established by clear and convincing evidence).

▬ The general standard of proof in Michigan civil cases is preponderance of the evidence. *See Blue Cross & Blue Shield of Michigan v. Milliken*, 422 Mich. 1, 89, 367 N.W.2d 1, 44 (1985). Further, the United States Supreme Court has held that the standard of proof for nondischargeability actions under 523(a) is "the ordinary preponderance-of-the-evidence standard." *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). In so holding, the Supreme Court explained that "[b]ecause the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants unless 'particularly important individual interests or rights are at stake.'" *Id.* at 286, 111 S.Ct. at 659.

▬ Based upon the "relevant data," and finding no important interests that would support the imposition of a heightened burden of proof, this court finds that the appropriate burden of proof to be applied in *constructive fraud* cases is the preponderance of the evidence standard. In deciding the issue, the court has applied that standard.

### D. *Damages.*

As an accommodation party to the loading dock and renewal notes, Word is entitled to reimbursement in the amount of $44,489.22 from TML's bankruptcy estate. Under the fraudulent conveyance action, Word is liable to TML's bankruptcy estate for $52,273.60, the amount by which the rent it collected under the 1994 lease exceeded the fair market rental value of the leased premises.[70] *See supra* Part IV.M.4.

---

**70.** The court's calculation of damages under the fraudulent conveyance claim is based on the *actual* rent paid by TML during the term of the 1994 lease, and thus eliminates the need to consider any past due rent owed by TML to Word. To the extent that the proofs of claim filed by Word in TML's bankruptcy case include amounts for past due rent, those claims shall be deemed satisfied.

Off-setting these amounts results in Word owing the TML bankruptcy estate a total of $7,784.38, with the Trustee retaining the remaining amount of the sale proceeds held in escrow for the benefit of creditors of the estate.[71]

## VI. CONCLUSION

The Trustee is not entitled to receive contribution from Word for payments TML made to FMB under the loading dock note. There was no merger of Word's title to the real property with an asserted assignment of mortgage from FMB to Word; even if there was a merger, it does not affect Word's ability to collect its reimbursement claim and retain the escrowed remaining proceeds of the sale. By preponderance of evidence, the Trustee prevails in his claim against Word to recover a constructive fraudulent conveyance. After offsetting the relief awarded by the court, the Trustee shall retain the funds in the escrow account and Word shall pay the Trustee $7,784.38, i.e., the unsatisfied amount of the fraudulent conveyance damages.

---

71. The court is now unaware of any possible issues regarding accrual of interest or imposition of costs or expenses. If either party asserts that such issues are outstanding, a supplemental hearing regarding the offset of damages and/or imposition of costs will be scheduled, provided that the request is made, in writing, within twenty days of the date this opinion and attendant judgment is served. If no hearing is requested, the judgment shall become final at the expiration of such period. Alternatively, if a hearing is timely requested, after the conclusion of the hearing, a final judgment will be issued by the court.